UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WESLEY BIRRELL, aka Bella-Christina Birrell,<br><br>Plaintiff,<br><br>v.<br><br>MICHELE DiTOMAS, et al.,<br><br>Defendants. | No.  2:22-cv-01528-KJM-EFB (PC)<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983.  She is incarcerated at the California Medical Facility (CMF), where defendant DiTomas was the chief medical executive (CME),[1] defendant Liu was a physician and surgeon, and defendant Footman was a correctional lieutenant.  Plaintiff asserts a variety of Eight Amendment claims predicated on her medical treatment at the facility.  Defendants have filed a motion for summary judgment.  ECF No. 25.  Plaintiff has not responded, despite having been granted five extensions of time to do so.  ECF Nos. 28, 30, 32, 37, 40.  Nonetheless, a careful review of the full record indicates that defendants' motion for summary judgment must be

---

[1] Plaintiff sues DiTomas in her capacity of acting CME at CMF.  ECF No. 1 at 3.  DiTomas's declaration states her position was the Assistant Deputy Medical Executive (ADME) over Palliative and Complex Care for the statewide California Correctional Health Care Services (CCHCS), and apparently she also filled the role of CME at CMF.  ECF No. 25-5 at 1 ¶ 1; *id*. at 2 ¶ 7; ECF No. 25 at 6.

1

granted on its merits.

## Plaintiff's Deposition Transcript

Defendants submitted excerpts of plaintiff's deposition transcript with their motion for summary judgment. ECF No. 25-12. In accordance with Local Rule 133(j), defendants lodged a copy of the entire transcript with the court which the court is considering on this motion. ECF No. 33. Although plaintiff has not responded to the motion, the court has reviewed the entire deposition transcript.[2] Accordingly, the court directs the Clerk to file the transcript on the public docket of this case.

## Factual Background

Plaintiff alleges that defendants were deliberately indifferent to her serious medical needs by temporarily removing her use of a CPAP machine[3] from December 13, 2020 until February 18, 2021. As plaintiff has not responded to the motion for summary judgment, the court bases its analysis on plaintiff's allegations as well as the evidentiary record submitted by defendants.

Plaintiff's medical records have been submitted with the declaration of B. Feinberg, M.D.[4] ECF No. 25-9 at 3 ¶ 7 (Feinberg Decl.); ECF No. 25-10 at 3-55 (medical records). Plaintiff was prescribed the use of a CPAP machine for her sleep apnea since 2007. ECF No. 25-10 at 10-11. The medical records relating to the original CPAP prescription are unavailable. *Id.*; *see also* ECF No. 25-9 at 4-5 ¶¶ 12-13.

On April 8, 2020 the California Correctional Health Care Services (CCHCS) issued a memo recommending review of CPAP need among the inmate population (the "April 8, 2020

---

[2] As discussed below, plaintiff's testimony does not controvert the analysis contained herein in any material way.

[3] The term "CPAP" refers to continuous positive airway pressure. *See* https://www.ncbi.nlm.nih.gov/books/NBK482178/. A CPAP machine is a device that blows air into a mask covering the nose and mouth thus maintaining continuous positive airway pressure for a sleeping person. *See* https://my.clevelandclinic.org/health/treatments/22043-cpap-machine.

[4] Feinberg, who is the Chief Medical Consultant for CCHCS Office of Legal Affairs, has offered his professional opinion. ECF No. 25-9 at ¶¶ 3, 33. The court has denied without prejudice plaintiff's motion to appoint a medical expert witness to counter Feinberg. ECF No. 32. The court here considers plaintiff's medical history and records submitted by Feinberg, but not Feinberg's professional opinion.

Memo" or "Memo"). ECF No. 25-6 at 3 (DiTomas). CCHCS sought to minimize risks of Covid-19 transmission through aerosol generating procedures (AGPs) which "may increase the risk of aerosolizing the SARS-CoV-2 virus." *Id*. at 2. CCHCS had determined that "[f]or most patients with sleep apnea on CPAP the short-term discontinuation of CPAP is less risky than potential for aerosolized virus spread with CPAP use during pandemic." *Id*. at 3. CPAP users with severe sleep apnea and comorbidities ("such as cardiomyopathy with history of arrhythmias") could continue using their CPAP machines but for them "safe single cell housing (with solid door) should be sought." *Id*. There is no evidence before the court that plaintiff had any such comorbidity.

Prison officials reviewed plaintiff's need for a CPAP machine and determined that under the new standards set forth in the Memo plaintiff should stop using the CPAP machine because she did not have both severe sleep apnea and comorbidities. As discussed below, plaintiff disagrees with the medical providers in that regard but has not identified facts showing she had either. Rather, she describes in her complaint sleep apnea in a mostly abstract manner without alleging her specific condition of sleep apnea,[5] and concludes with an assertion that "Obstructive Sleep Apnea is considered a serious medical condition requiring medical intervention and treatment." ECF No. 1 at 8 ¶ 11. She makes the conclusory allegation that she depended on the CPAP machine "to ensure that she did not die in [her] sleep due to oxygen starvation or suffer acute and severe asphyxia." ECF No. 1 at 3 ¶ 5.

Defendant DiTomas declares that her team conducted reviews of CPAP need and that she consulted with primary care physicians, the chief physician, and the respiratory therapist. ECF No. 25-5 at 2 ¶ 5. A record of plaintiff's February 10, 2020 consultation with her endocrinologist (Dr. Montejo) lists "obstructive sleep apnea" as one of plaintiff's ongoing medical conditions, without qualification as to severity. ECF No. 25-10 at 4. Feinberg points out in his declaration that plaintiff's sleep apnea condition "was not noted to be severe." ECF No. 25-9 at 3 ¶ 9.

---

[5] For example, plaintiff characterizes sleep apnea generally and states that "[t]he condition is usually marked by recurrent sleep interruptions, snoring, choking, [] and in some cases, even death." ECF No. 1 at 7 ¶ 10. She adds that "[t]he frequent awakenings that sleep apnea patients experience leaves them continually sleepy and may lead to personality changes such as irritability or depression." *Id*. at ¶ 11.

3

According to DiTomas, plaintiff was determined to have only a mild case of sleep apnea and no additional factors that would put plaintiff at heightened risk based on pulmonary charts and medical history. ECF No. 25-5 at 2 ¶ 5. This meant plaintiff was ineligible to retain her CPAP device. *Id*.

The parties appear to agree that plaintiff did not have the specific comorbidities mentioned in the Memo (cardiomyopathy with history of arrhythmias), but plaintiff argues that she had "a host of medical issues that require medical intervention and treatment" which she says should have qualified her to keep the CPAP machine. ECF No. 1 at 7 ¶ 9. She contends that she was housed in a single cell with a solid door, which satisfied one of the recommended criteria for continued use of a CPAP machine. *Id*. at 9 ¶ 14; ECF No. 25-6 at 3.

A third issue is whether plaintiff's CPAP machine was a type of AGP device encompassed by the April 8, 2020 Memo. Plaintiff alleges she was not using the water tank feature on her CPAP machine and "therefore since there was no liquid involved in the operation of the Plaintiff's C-PAP, by definition, the C-PAP <u>WAS</u> <u>NOT</u> an 'AGP' device." ECF No. 1 at 15 ¶ 34 (emphasis in original). Defendants appear to maintain that plaintiff's CPAP machine was within the scope of the Memo, and the record does not indicate whether plaintiff brought this issue to defendants' attention.

DiTomas, who was not plaintiff's primary care physician and who did not personally interact with plaintiff on this matter, declares that she "was the medical authority that ordered the removal of the CPAP power cords at CMF in accordance with the April 8 memorandum" and in plaintiff's case DiTomas ordered removal because plaintiff had mild sleep apnea and no additional factors for heightened risk. ECF No. 25-5 at 2 ¶¶ 4-6. Nevertheless, the supervising physician (Dr. Osman) decided as of April 16, 2020 to allow plaintiff to keep the CPAP machine, apparently based largely on plaintiff's single cell housing. ECF No. 25-9 at 5 ¶ 14 n.3; ECF No. 25-10 at 12 (nursing note to "please advise [plaintiff] that she is in a single dorm per Dr. Osman, and that at this [time] no attempts to remove her nebulizer will be made per Dr. Osman"). It appears that in the days prior to Osman's decision plaintiff had initiated a grievance objecting to the prospective removal of the CPAP machine. ECF No. 25-10 at 11 (notes of April 11, 2020

4

nurse visit in which plaintiff reported fears of dying in her sleep without the CPAP and had sought a mental health evaluation for stress); *see also id*. at 13 (notes of nurse interview regarding grievance conducted May 21, 2020). It is unclear from this record whether DiTomas was informed of Osman's decision to give plaintiff an exemption as of April 16, 2020. *See id*. at 12. However, by the end of that year circumstances had changed significantly.

The prison experienced widespread Covid-19 infections in December 2020. ECF No. 25-9 at 5 ¶ 16 (Feinberg Decl.). On December 13, 2020, the respiratory therapist (Sirenchenko) asked plaintiff to surrender the CPAP power cord. ECF No. 1 at 8-9 ¶ 13. Plaintiff refused and asked to see a doctor's order to discontinue CPAP use. *See id*. at 9 ¶ 16. Prison staff acting on the authority of defendant Footman thereafter took the power cord while plaintiff was in the shower. *Id*. at 10 ¶ 18.

Defendant Dr. Liu declares that the medical chief (Osman) had instructed her to provide information to inmates about the temporary removal of CPAP access, because Liu was the on-call physician that day. ECF No. 25-7 at 2 ¶ 2; *see also* ECF No. 1 at 4 (complaint alleges that Liu "was dispatched to speak with Plaintiff"). Plaintiff complained to Liu, who told plaintiff the power cord would be returned as soon as safe to do so. ECF No. 25-8 at 2. Liu denies responding to plaintiff's concerns with the comment "well, hopefully you survive!" ECF No. 25-7 at 2 ¶ 4; *see* ECF No. 1 at 11 ¶ 20 (alleging the comment).

Plaintiff alleges that after the CPAP machine was removed

> … Plaintiff would awake gasping for air, unable to obtain enough oxygen, or suffering from acute oxygen starvation and severe air hunger, with an exacerbation of Plaintiff's chronic, painful migraine headaches as well as Plaintiff being continuously tired or exhausted and unable to stay awake, but also unable to sleep due to acute choking episodes and the intense feeling like Plaintiff was suffocating no matter how hard or vigorously Plaintiff would try to breathe and obtain sufficient air once woken.

ECF No. 1 at 14 ¶ 29.

But none of the six requests for health care that plaintiff submitted between December 25, 2020 and February 3, 2021 mentioned difficulties related to removal of CPAP access.[6] ECF No.

---

[6] Plaintiff also had a Covid-19 infection during this time period, testing positive on December 14, 18, and 22, 2020. ECF No. 25-9 at 6 ¶ 20 (Feinberg Decl.).

5

25-9 at 6-8 ¶¶ 21-29 (Feinberg Decl.). Four of plaintiff's health care requests were for medication refills, a fifth asked to flush plaintiff's catheter, and the sixth was for back pain. ECF No. 25-10 at 38-39, 48-51.

On February 8, 2021, plaintiff submitted a seventh health care request complaining of disturbed sleep and "waking up at night gasping for air," and asking to resume CPAP use. ECF No. 25-9 at 8 ¶ 30; ECF No. 25-10 at 52. On February 11, 2021, a nurse reported that plaintiff asked for a review of her CPAP status and to have CPAP use restored. ECF No. 25-10 at 53. The CPAP power cord was returned to plaintiff on February 18, 2021 on Osman's instruction. *Id*. at 55; ECF No. 25-9 at 9 ¶ 32.

<u>Summary Judgment Standard Under Rule 56</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing

7

party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

Deliberate Indifference In Medical Care

To succeed on an Eighth Amendment claim predicated on deliberate indifference to medical need, a plaintiff must establish that: (1) she had a serious medical need; and (2) the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096.

Deliberate indifference to a serious medical need exists if the defendant knows that the inmate "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Deliberate indifference requires a purposeful act or failure to act on the part of the defendant and resulting harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992). Deliberate indifference may be shown by denial, delay, or intentional indifference toward medical treatment, or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.* However, it is important to differentiate common law negligence claims of malpractice from claims predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment in asserting the latter. "Mere 'indifference,' 'negligence,' or 'medical malpractice,' will not support an Eighth Amendment claim. *Broughton v. Cutter Laboratories*, 622 F.2d 4548, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. 97, 105-06 (1976)).

////

Mere disagreement among medical providers on an acceptable course of treatment is not evidence of deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "Rather, to prevail on a claim involving choices of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Further, a plaintiff must have suffered some type of pain or harm that is more than de minimis to implicate the Eighth Amendment. *See, e.g.*, *Shapley*, 766 F.2d at 407 (delay of surgery is insufficient, unless harmful).

Analysis of Defendants' Summary Judgment Motion

A.  Sleep Apnea As A Serious Medical Need

Even though defendants submit evidence that plaintiff's sleep apnea was mild with no heightened risk factors, they appear to assume for purposes of this motion that it may be a serious medical need. *See* ECF No. 25 at 10 ll.26-27 (defendants "[b]roadly constru[e] Birrell's deliberate-indifference claim to assume that sleep apnea is a condition presenting a serious medical need"). The question whether sleep apnea is a serious medical need may depend on the degree of severity of the individual's case. "[A] diagnosis of sleep apnea can include a wide range of conditions" and even a prescription for a CPAP machine "does not necessarily suggest that [plaintiff's] sleep apnea is serious or life threatening." *Pettigrew v. Shelby County Corr. Ctr. Warden*, No. 22-1101-SHM-tmp, 2023 WL 2724242, at *8 (W.D. Tenn. Mar. 30, 2023); *see also Lee v. Sewell*, 159 F. App'x 419, 421 n.3 (3d Cir. 2005) (sleep apnea is a "*potentially* serious medical need" (emphasis added)).

There is little case law from the Ninth Circuit Court on the matter. In *Pullano v. No. 8170, CCDC Guard*, No. 2:10-cv-335-MMD-VCF, 1012 WL 4490884, at *10, 11 (D. Nev. Sept. 27, 2012, the district court had "assumed" the seriousness of an uncontested allegation of severe sleep apnea but granted summary judgment on the grounds that plaintiff had not shown he suffered serious harm from being denied use of a CPAP machine. The Ninth Circuit Court reversed because there was a genuine dispute whether the prisoner had experienced pain and suffering that did not serve any penological purpose. *Pullano v. Brammer*, 684 F. App'x 643, 644

9

(Mem.), No. 15-16840 (9th Cir. Mar. 21, 2017).[7]

In a case presenting facts strikingly similar to this one, prison authorities at Chukawalla Valley State Prison removed a prisoner's CPAP power cord based on the same April 8, 2020 Memo under consideration here. *Fitts v. California Corrections Healthcare*, No. 5:22-cv-1935, 2024 WL 4933583, at *2 (C.D. Cal. Sept. 27, 2024). The court found that the prisoner's specific condition of sleep apnea and associated symptoms failed to "cross the threshold required to establish a serious medical need" before or at the time CPAP use was discontinued. *Id*. at *5-6. The prisoner's medical history did not show he had severe sleep apnea, comorbidities, and other severe symptoms. *Id*. at *5. A month later, the prisoner reported sleepless nights, coughing, choking, and headaches, and asked to restart CPAP use. *Id*. at *4, 5. The CPAP power cord was returned the next day. The court acknowledged that its "analysis is notably temporal in nature," because the prisoner had not shown his sleep apnea was sufficiently serious at the time that CPAP use was discontinued. *Id*. at *5; *see also Cox v. Daram*, No. 2:20-cv-1295 KJM DB P, 2021 WL 3662392, at *8 (E.D. Cal. Aug. 18, 2021) (denying request for preliminary injunction ordering prison officials to allow CPAP use for prisoner with mild sleep apnea).

As noted, plaintiff has failed to respond to the motion. But on this incompletely briefed motion, and construing all reasonable inferences in plaintiff's favor, the court assumes for purposes of this motion that plaintiff had a serious enough condition of sleep apnea that, either singly or in combination with other diagnosed conditions, it constituted a serious medical need at the time plaintiff's CPAP access was temporarily removed.

---

[7] District courts have allowed general allegations of sleep apnea to survive screening or a motion to dismiss. *E.g.*, *Horton v. Frazier*, No. 3:22-cv-487, 2022 WL 20472470, at *4 (D. Nev. Nov. 21, 2022) (screening); *Goudlock v. Perez*, No. 08cv204 AJB(RBB), 2012 WL 846444, at *5 (S.D. Cal. Mar. 13, 2012) (on motion to dismiss, sleep apnea "may be a serious medical condition"); *see also Coleman v. Moore*, No. 1:23-cv-324-CDB, 2024 WL 6078127, at *8 (E.D. Cal. Nov. 6, 2024) ("moderate obstructive sleep apnea and the related need for [a] prescribed CPAP device" stated a serious medical need for purposes of screening).

On motions for summary judgment courts may require a more explicit showing that plaintiff's sleep apnea is a serious condition. *Escalera v. Corizon Health Inc.*, No. CV 19-4934-PHX-MTL (JFM), 2020 WL 5593848, at *5-6 (D. Ariz. Sept. 18, 2020) (denying summary judgment regarding severe case of sleep apnea); *see also Stone v. Harbaugh*, No. 2:23-cv-10855, 2025 WL 1892531, at *4 (E.D. Mich. June 2, 2025) (granting summary judgment because lifelong sleep apnea that was treated with CPAP machine for a few years before it was removed was not a sufficiently serious medical condition to proceed to trial).

10

The court next addresses whether the individual defendants were deliberately indifferent to that serious medical need.

B.       Defendant DiTomas

Plaintiff and DiTomas agree that DiTomas was not plaintiff's primary care physician, but rather she led the team that determined plaintiff was ineligible to continue using the CPAP. ECF No. 1 at 3 ¶¶ 5; *id*. at 17 ¶¶ 39, 40; ECF No. 25-5 at 2 ¶ 6. DiTomas declares that the decision was based on the team's evaluation of plaintiff's pulmonary charts and medical history in which plaintiff "was determined to have only a mild case of sleep apnea" and "no additional factors that would have put [plaintiff] at heightened risk." ECF No. 25-5 at 2 ¶ 5.[8]

It appears from this record that plaintiff's supervising physician (Osman) is the person who authorized plaintiff to keep the CPAP as of April 17, 2020, suggesting that it may have been Osman who decided to exempt plaintiff's CPAP use at that time. ECF No. 25-10 at 11-12. Plaintiff alleges it was DiTomas who ordered removal of plaintiff's CPAP power cord on December 13, 2020, and Liu declares that Osman directed her to discuss the removal with plaintiff. ECF No. 1 at 8-9 ¶¶ 13, 15; ECF No. 25-7 at 2 ¶ 2. Osman thereafter authorized the return of the power cord on February 18, 2021. ECF No. ECF No. 25-10 at 55. At most, this record indicates that even if Osman and DiTomas disagreed about exempting plaintiff's CPAP use as of April 2020, Osman thereafter reassessed and aligned with DiTomas to suspend plaintiff's CPAP access as of December 2020 when Covid-19 infections at the prison had become widespread.

Plaintiff does not allege, and the record does not otherwise indicate, any material change in plaintiff's sleep apnea condition, co-morbidities, single-cell housing status, or the AGP feature of plaintiff's CPAP. The record instead indicates that the Covid-19 outbreak in the prison in

---

[8] Plaintiff's deposition testimony does not establish a genuine issue of material fact as to this medical assessment. Plaintiff could not quantify the severity of her sleep apnea condition because it was "beyond [her] scope of knowledge." Pl. Depo. Tr. 54 l.25 - 55 l.1. She testified that her sleep apnea was "to the max" while her CPAP use was suspended between December 2020 and February 2021, but this is not indicative of where her condition fell on the mild to severe spectrum or whether her sleep apnea was known to be severe at the time DiTomas decided to suspend CPAP use. *Id*. at 53 l.22 - 54 l.18; *see also Fitts*, 2024 WL 4933583, at *5 (prisoner did not show sleep apnea was sufficiently serious at the time CPAP use was discontinued).

1  December 2020 had changed the risk environment and prompted Osman's reassessment.  If
2  DiTomas disagreed with Osman's decision to allow plaintiff to keep the CPAP machine as of
3  April 2020 (which is unclear from this record) that itself is not evidence of deliberate
4  indifference.  *See Toguchi*, 391 F.3d at 1058.  Similarly, if DiTomas and/or Osman decided to
5  suspend plaintiff's CPAP use in changed circumstances in December 2020, that also is not
6  evidence of deliberate indifference on the part of DiTomas.  To the contrary, is shows that these
7  medical providers were focused on the medical issue and attempting to arrive at a course of
8  treatment that presented the least risk under the circumstances.  A changed course of treatment is
9  still within the purview of a medical professional weighing developing risks and benefits.

10  Plaintiff cannot show a genuine issue as to whether DiTomas was objectively or
11  subjectively deliberately indifferent to plaintiff's sleep apnea condition in assessing CPAP need,
12  whether as of April 2020 or as of December 2020.  The April 8, 2020 Memo clearly stated that
13  "[f]or most patients with sleep apnea on CPAP the short-term discontinuation of CPAP is less
14  risky than potential for aerosolized virus spread with CPAP use during pandemic."  ECF No. 25-6
15  at 3.  DiTomas, in consultation with other medical staff, determined that plaintiff's case fell into
16  the category of "most patients with sleep apnea on CPAP" for whom suspending CPAP use was
17  "less risky" than continuing.  The primary consideration for an exemption was whether an inmate
18  had severe sleep apnea and comorbidities.  *Id*.  DiTomas, in consultation with her team, also
19  determined that plaintiff did not meet the exemption criteria.

20  The Memo did not mandate any exemption based solely on single call status or whether
21  AGP was in use.  Plaintiff's argument that her CPAP use fell outside the Memo's parameters
22  because she claims she was not using the water tank feature is also unpersuasive.  CPAP use with
23  or without water tank was still within DiTomas's purview to choose a course of treatment.
24  Further, plaintiff's non-use of the water tank was apparently at her own discretion and thus
25  changeable.  Plaintiff cannot show a genuine issue as to whether DiTomas's decision to suspend
26  plaintiff's CPAP use in December 2020 was medically unacceptable under the circumstances
27  presented, or as to whether the decision was made in conscious disregard of an excessive risk to
28  plaintiff's health.  Accordingly, summary judgment must be entered in favor of DiTomas.

### C. Defendant Liu

Plaintiff and defendant Liu agree that Liu was tasked to discuss the CPAP suspension with plaintiff on December 13, 2020. ECF No. 1 at 4; ECF No. 25-7 at 2 ¶ 5. Liu did not make the decision to suspend CPAP access. ECF No. 25-7 at ¶¶ 2-3. Liu declares that Osman, as medical chief, informed Liu of the inmates (including plaintiff) whose CPAP access was to be temporarily removed and instructed Liu to discuss this with them.

Plaintiff alleges she informed Liu that plaintiff "could stop breathing during the night and suffocate or suffer respiratory arrest during the night which would lead to sudden death or [] suffer some other injury and damage to other body ordans including having a [] stroke." ECF No. 1 at 11 ¶ 20. Liu's note of her December 13, 2020 interaction with plaintiff is that Liu and plaintiff discussed

> … the need to temporarily remove [plaintiff's] CPAP tubing due to elevated COVID 19 risk currently. He asked for custody to be present during the conversation. He collected the names of the CME, Chief, my own, and those of custody and declined to give up the hose, stating "I understand having a CPAP is my right, I'm in a single cell, I'm not going to voluntarily have it removed." During the discussion, he looks to custody behind him and says "You just got it out of my cell didn't you?" and the officer confirms that the Lieutenant has done so. Mr. Birrell is visibly upset about this. I reassured him that it will be returned to him as soon as it is safe to do so. We discussed the risks of COVID19 and how CPAP use significantly increases the risk. I refer to the Memo from April 2020 that outlines the criteria for risks of CPAP use and encourage him to work with us right now for everyone's safety.

ECF No. 25-8 at 2.

There is no genuine factual dispute as to Liu's limited role in implementing and discussing the decision to remove plaintiff's power cord. The generalized concerns which plaintiff alleges she articulated during their discussion did not demonstrate a specific facts showing excessive risk to plaintiff. Plaintiff cannot show a genuine issue as to whether Liu had subjective or objective awareness that suspending plaintiff's CPAP access would create a substantial risk of serious harm to plaintiff in the circumstances presented, for similar reasons that plaintiff cannot make such as showing against DiTomas. Liu did not act with wanton disregard, even if she made the (contested) statement "hopefully you will survive." Summary judgment must be entered in favor of Liu as well.

13

D.  Defendant Footman

"It is generally reasonable for correctional officers to rely on the judgments of medical professionals, including nurses or other members of the prison medical staff." *Barbic v. Chirinos*, No. 2:20-cv-7071-FLA-JC, 2024 WL 3542573, at *7 (C.D. Cal. June 4, 2024) (collecting cases).[9] Plaintiff does not allege that Footman had any medical expertise. Quite the contrary, plaintiff alleges that Footman is "untrained, uneducated and lacks even the basic rudimentary understanding of the human pulmonary system." ECF No. 1 at 5. Footman agrees that she is not a medical professional in any capacity, had no authority over decisions regarding facility-wide use of medical equipment, and relied on the decision of medical professionals regarding implementation of the CPAP policy. ECF No. 25-3 at 1-2.

Plaintiff alleges a misunderstanding or inconsistency between the accounts of Footman and Liu, according to the following sequence of events: (1) the power cord was removed while plaintiff was in the shower the morning of December 13, 2020; (2) Liu and plaintiff had a conversation after plaintiff's shower, during which Liu indicated to plaintiff that Liu was unaware Footman had "ordered forced compliance with the request to seize the C-PAP power cords;" and then (3) two hours later plaintiff received a search receipt signed by Footman that stated the cord was removed on Liu's order. ECF No. 1 at 4-5 ¶¶ 6-7; *id*. at 9-10 ¶¶ 17-19. The receipt is attached to Footman's declaration, and it does state that the cord was removed "pursuant to Dr. Liu's order." ECF No. 25-4 at 2. Footman declares that she signed the receipt "on the premise that Dr. Liu was the medical staff present for execution of the CPAP policy implementation." ECF No. 25-3 at 2 ¶ 4. Footman also states her "understanding [] that the order to revoke CPAP machines came from medical professionals at headquarters level." *Id*.

Plaintiff cannot support her allegation that Footman "grossly exceeded her authority" by "deliberately [taking] it upon herself to interfere with, and wantonly deprive[] Plaintiff of her required, medical treatment device without a written order from Plaintiff's treating physician[.]"

---

[9] The possible exception to the general rule is if the non-medical prison official has reason to believe that medical staff have ignored a prisoner's serious medical needs. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Footman declares she had "no personal knowledge or awareness of Plaintiff Birrell's medical conditions[.]" *Id*. at 2 ¶ 5.

ECF No. 1 at 5-6.  Plaintiff's arguments about whether Liu personally ordered Footman to remove the power cord are immaterial because it is clear that Footman acted on the assessment of medical professionals, even if plaintiff disagrees with the order and/or with the qualifications of those medical professionals.  There is no genuine dispute as to whether Footman was deliberately indifferent in implementing the directive of medical professionals to remove plaintiff's CPAP power cord.  Summary judgment must be entered on behalf of Footman.

Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  ECF No. 25 at 13-14. Qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted).  A defendant is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2010).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Id*. at 743.

Showing the unlawfulness of the conduct was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Id*. (citation and internal quotation marks omitted); *see also Kisela v. Hughes*, 540 U.S. 100, 105 (2018) (per curiam) ("An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" (citation omitted)).  "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (alteration in original) (quoting *Wesby v. District of Columbia*, 583 U.S. 48, 64, 138 S. Ct. 577, 590 (2018)).

The Supreme Court has warned courts not to define clearly established law "at too high a level of generality."  *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Kisela*, 540

1  U.S. at 104.  "[T]he farther afield existing precedent lies from the case under review, the more
2  likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps
3  regrettable but is at least arguably constitutional."  *Hamby v. Hammond*, 821 F.3d 1085, 1095
4  (9th Cir. 2016).  But "officials can still be on notice that their conduct violated established law
5  even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that
6  "a general constitutional rule already identified in the decisional law may apply with obvious
7  clarity to the specific conduct in question, even though 'the very action in question has [not]
8  previously been held unlawful'") (alteration in original) (quoting *United States v. Lanier*, 520
9  U.S. 259, 271 (1997)).

10      Whether such a clearly established right exists is "a question of law" for the court to
11 decide.  *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017)).  A clearly established right does not
12 require case law that is "on all fours" with the facts at issue, but rather "existing case law must
13 have placed the statutory or constitutional question beyond debate … in light of the specific
14 context of the case."  *Bird v. Dzurenda*, 131 F.4th 787, 790 (9th Cir. 2025) (simplified).

15      Although the court need not resolve the question of qualified immunity given the analysis
16 above, it does not appear that plaintiff can show an indisputable statutory or constitutional right to
17 continue using her CPAP machine 1) in the context of a prison-wide Covid-19 outbreak, and 2)
18 where medical professionals have assessed that plaintiff's sleep apnea is not sufficiently serious
19 to warrant granting a policy exemption.  The Eighth Amendment requires prison officials to
20 assess a prisoner's medical needs, and to address those needs in a manner that is not deliberately
21 indifferent to any substantial risk of serious harm.  The court is not aware of any clearly
22 established law that would have informed DiTomas that CPAP usage must continue regardless of
23 individualized medical assessment that plaintiff's need for her CPAP did not outweigh the risk of
24 spread of a contagion.[10]  Nor is the court aware of any clearly established law that would have
25 informed Liu or Footman that they must not rely on the decision of medical professionals to

---

[10] As already noted, the court has set aside the uncertainties around whether plaintiff had only a mild case of sleep apnea and whether the Ninth Circuit Court would conclude that mild sleep apnea is or is not a serious medical need.  To the extent that a fact-finder might conclude that plaintiff had only mild sleep apnea, the uncertainty about whether plaintiff had a serious medical need would be an additional basis for granting qualified immunity to defendants.

16

remove plaintiff's CPAP power cord on December 13, 2020.

**ORDER**

The Clerk is hereby ORDERED to enter the full transcript of plaintiff's deposition (see ECF No. 33) onto the docket of this case.

**RECOMMENDATION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1) Defendants' motion for summary judgment (ECF No. 25) be GRANTED, judgment entered for defendants, and this case closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 4, 2025

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE